GRIFFITH v. CHARLOTTE, COLUMBIA & AUGUSTA R. R. CO.

1. Where all the issues in a law case are referred by consent to a referee to hear and determine them, his findings of fact may be reviewed and reversed by the Circuit Judge; and the judge's decision upon the facts is final.

2. Property defined; and its essentiality to the plaintiff in an action for damages considered.

3. An administrator has no property in the cadaver of his intestate, and therefore cannot maintain an action for its wilful and negligent mutilation, but he may sue for injury to the wearing apparel of the deceased.

Before ALDRICH, J., Lexington, September, 1883.

This was an action by David J. Griffith, as administrator of W. Scott Hook, deceased, against the Charlotte, Columbia & Augusta Railroad Company, commenced October 6, 1881. The decision of the Circuit Judge was as follows :

This cause was argued before me in Columbia, on exceptions to the report of the referee, Mr. Assmann, the clerk of the court of Lexington. The case was called for a hearing at the fall term of the Lexington court, when, by consent of the attorneys for plaintiff and defendant, I made the following entry on the calendar : "To be heard in Columbia, by agreement of counsel made in open court."

When the case was called for a hearing in Columbia, several objections were made, as in the case of Meetze *v.* same defendant. First. That no case had been settled and I could not hear it. I ruled, as in Meetze's case, that all the papers and proceedings being in writing, the party may waive a "case." Second. After the reading of the papers, the plaintiff objected to my hearing the case for want of jurisdiction. Since filing my opinion in the Meetze case, I have had the opportunity of consulting with eminent members of the bench and bar, and find that the practice is as stated in argument, that unless the appeal comes up from the Circuit Court the Supreme Court will not hear it. This being so, it will be unnecessary to repeat the reasons which governed me in deciding to hear the case on the papers. I refer to that case if it be necessary.

I now proceed to consider the case on the report of the referee, who has awarded $10,000 damages against the defendant for mutilating the corpse of the plaintiff's intestate. When I first heard of the action, I naturally inquired what property has the administrator in the corpse of his intestate. It cannot be ap-

praised. "It cannot be assets in his hands for the payment of debts. It cannot be an estate for distribution among the heirs at law, for the corpse would be buried and in a state of decomposition before letters of administration could be granted." But after hearing the very able and exhaustive argument of Mr. Youmans for the plaintiff, and the equally competent and learned argument of Mr. Rion for the defendant, I confess I have been exercised in coming to a conclusion in a case of this novel impression.

The fact is the intestate was murdered and his corpse put on the railroad track to conceal the crime. The assassin has been twice tried, twice convicted, and is now serving his term of life imprisonment in the penitentiary, the governor having commuted his sentence. So that the first question is, who is responsible for the mutilation of the dead body? The murderer who put it on the railroad track or the railroad company whose engines ran over it? The doctrine of contributory negligence is explicit and very well settled. If an individual, by his own act, contribute to his own injury, he cannot recover damages. Suppose, instead of killing the intestate, the assassin had tied him on the track and the trains run over him, who would have been the murderer? Now, does it follow if A kills B and places his body on the railroad track to conceal his crime, that the railroad company, and not the murderer, is liable? I think not. The man who committed the murder and then to conceal his crime placed the body on the track, thereby trespassing on the right of way of the railroad company, is the responsible person. It would be an unusual state of the law to indict one man for the killing of another and recover damages from a railroad company for the mutilation of the corpse which he has slain and placed in the track of the engine and train to conceal his crime.

Who has been hurt? The man was dead when he was put there; he has suffered no pain, no mental anxiety, no doctor's bill, no loss of time; there is nothing on which to assess damages. It is true, the dead man did not contribute to the mutilation, but after he was murdered, the assassin placed his lifeless body on the track, caused the mutilation, and was the active agent in the injury complained of in this action. But what

interest has the administrator in a dead body ?　It is not assets to pay debts, not an estate to be distributed, it can never come into his possession for any purpose whatsoever, because before he can take out his letters of administration it will be rotting in the grave, food for worms.　What can he do with a dead, buried, and decomposing body ?　Literally nothing, the worms are rioting in the corpse before the administrator has the right to possess the estate ; and in this case, as I gather from the report, the intestate had no estate but his corpse.

So I conclude, if there is any damage, it is not to the administrator, but to the family of the intestate, and the only damage they can suffer is the injury to their feelings and sentiments.　If, therefore, any right of action exists in any one, it is not in the administrator, who has neither possession nor property in the corpse, but in the family of the deceased, who may be able to say, we have been injured in our feelings and sentiments.　It is like an action for the recovery of real estate : the heirs at law must sue, the administrator has no title.　The action cannot be maintained.　But as this is a novel question and has been pressed with singular ability on both sides, it may not be improper to consider it more at large.

On the night of October 8, 1879, the dead body of Scott Hook was placed on the track of the defendant railroad company. It will appear from the testimony that Hook was killed on October 8, 1879, by one Squire Clark, who was twice convicted of the murder, and that the dead body was placed in the centre of a curve, between Gilbert Hollow and Summit, near half or three-quarters of a mile from the latter place.　Early next morning the body was discovered, horribly mangled, three trains having passed over it in the following order : First, freight train north, at 11 p. m. ; second, freight train south, at 3.20 a. m. ; third, passenger train south, at 6.30 to 7 a. m.　Certainly if these trains, managed by three sets of employees, had intentionally mutilated the corpse of the dead man, against whom they had no cause of enmity, who they did not know was on the track, and who could have been discovered by ordinary care and diligence, it would have shown such wanton negligence, hearts so destitute of social duty, as to demand some punishment.　But

by what proceeding and in what court, it is not necessary for me to inquire.

Do the facts proved make out a case of negligence? I think not. This question turns on the facts, how far off the engineer could have discovered the dead body on the track; in what distance the trains could have been stopped. Let us examine these questions, giving full force to the testimony of the plaintiff's witnesses. It is naturally to be supposed that the body of the murdered man was placed on the track so as not to be easily discovered. Hence it was placed in a curve, where the head-light of the engine would not be thrown upon it until near that point where the body had been placed. I think this is clear from the fact that the engineer of the first freight train going north at 11 p. m. did not know he passed over the body until he was telegraphed to at Wilmington, when, on examination, he discovered blood on the under works of his engine. It had rained the evening before and was hazy when Clarkson's train passed the next morning with his head-light burning. Trains 1 and 2 passed in the dark of the night. These trains were heavy freight trains, and the managers of them not likely to observe any jar occasioned by running over a soft and yielding body.

The plaintiff does not say how far the body could have been observed. He gives it as his opinion one hundred and sixty yards, but with great candor adds: "I will not say how far a body on the track can be seen by head-light;" but says, "I have no experience in running engines." The Rev. Mr. Crouse, of Georgia, thinks a heavy freight train could have been stopped in fifty yards, but properly qualifies his opinion by saying, "I am no railroad man." This is the proof of negligence by these non-expert witnesses on the part of the plaintiff, and it would be hard to say that a *prima facie* case of negligence has been made out. But assume that it has, what does the undisputed proof of the defendant railroad establish? As to all the trains, the track was slippery from the rain, and they could not be so easily stopped. The first passed at 11 p. m. Alexander, an engineer of eleven years' experience, says it was a heavy train; could not see a body further than forty or fifty yards by head-light, and could not stop train within three hundred yards. As to the sec-

ond train, he also testifies, going north as it was, the body could have been seen at same distance; but being up grade, the train could have been stopped in about one hundred yards. As to this train, the defendant's counsel had made a mistake as to who were the employees, and offered to produce them, but it was understood no advantage would be taken of their non-production. As to the third train, Mr. Clarkson, a conductor for thirty years, and Mr. Fell, an engineer for twenty-two years, say that the body could not have been discovered more than thirty yards, and the train stopped within one hundred yards. The difficulty in seeing was of course increased by the body having been run over by two heavy freight trains. The trains were proved to have been in good order, head-lights lit, all usual precautions taken, and the body not discovered until after it was run over the third time.

Now, if we apply the rule in *Danner's Case* to this, and the defendant, the railroad company, has not met the requirements of that rule, then we are forced to the conclusion that practically the Danner rule means that the fact of killing stock means that the company is liable unless it can disprove negligence, which it cannot do. This question of negligence is a mixed question of law and fact, and may properly be considered by the court. It is hardly to be conceived that three trains on the same railroad, at the same point, on the same night, were manned by fiends in human shape, if the act was intentional, or if by gross negligence, who were so neglectful of their own lives and limbs, as well as the safety of passengers, merchandise, and trains, as to wantonly run the risk of derailing the train and producing a general wreck.

I do not see how the conclusion of negligence was reached. The body was clothed in blue cloth, placed in the middle of a curve, two heavy freight trains passed over it without knowing there was an obstruction. The third, a passenger train, and not so heavy, discovered the jar and stopped. The only evidence of carelessness is that of the plaintiff and the Rev. Mr. Crouse, who both acknowledged to their want of experience. Against this is the positive declaration of Mr. Clarkson, Mr. Alexander, and Mr. Fell (the former has thirty years' and the latter twenty-two

years' experience), who all say that the body could not have been seen over forty yards, or the train stopped under one hundred.

Ordinarily the finding of a referee, like the verdict of a jury, will not be disturbed, unless the same be manifestly against the weight of evidence, for the reason so frequently assigned that the witnesses are known to them, examined in their presence, and they have the best opportunity of judging of the credibility of the testimony of each. In this case, however, there is not the slightest allegation, or most remote suspicion, that these witnesses on either side have testified with prejudice. It so happened here that I have known Mr. Clarkson and his father's family for many years; he is a gentleman of birth, character, and education, as reliable a gentleman, I would say, as any man in the State. It is impossible to suppose that such a man would testify falsely to save his life, much less his position as a railroad conductor. Much stress was laid in the argument that after the train was stopped, and Mr. Clarkson had gone to the rear end, he saw the body lying on the track. He does not say that. "From rear end of train to body 125 or 150 yards; run it very quickly. I saw it from rear end of train, but was so indistinct, could not tell what it was." I am at a loss to conceive how the conclusion of negligence was attained. It would be a libel on human nature, under these circumstances, to come to such a conclusion. My conclusion of law, therefore, is that the defendant railroad is not liable for any injury caused by its trains running over the corpse.

But suppose the facts proved showed culpability on the part of the defendant railroad, would it be liable for more than the value of the clothing? A corpse has no value, and, what is more, this corpse has no value proved. I would stop here, but for the learned and classic argument of Mr. Youmans to disprove the time-honored maxim that a corpse is no one's property. I am not prepared to dispute the confident assertion of the learned counsel that my Lord Coke made a mistake in his etymology of the word cadaver, for I am not sufficiently versed in the classics to do that, but the argument inclines me to the opinion that he did; nor that he meant to say, "the right of burial," and not "a dead body." And here, I think, is the view of the argument:

the learned counsel has treated *the right of burial* the same as *the right of property*. Undoubtedly, if we threw a corpse in the street or dug it from the grave for dissection, an action would lie, not for the injury to the property in the corpse, but for the trespass; and the jury, in assessing damages, might well take into consideration the outrage against decency and humanity and the violence done to the feelings and sentiments of the family and friends of the deceased.

Coke was understood to say that "a dead body was the property of no one." No matter what he did say; this understanding, or misunderstanding, has come down to us *as law*. As to the meaning of "cadaver" there can be no doubt. It is now an English as well as Latin word. Webster and other lexicographers say it is a dead human body, a corpse. The maxim of Lord Coke, *cadaver nullius in bonis*, has been translated to our day *in verbis*, or in equivalent terms. Blackstone says: "But though the heir has a property in the monument and escutcheons of his ancestors, yet he has none in their bodies or ashes." In Jacob Fisher's Digest it is said: "A dead body belongs to no one by law, and is, therefore, under the protection of the law." Wharton says: "*Corpus humanum non recipit estimationem.*" Bishop has it: "There can be no property in a person deceased, consequently larceny cannot be committed of his body." And even the novelist says: "The heir has a property in the monuments of his ancestors, but none in their ashes."

This judgment is already longer than is my habit, but as the case has been very earnestly and elaborately argued, I am anxious to show to the learned counsel that I have given it a careful consideration. One more reflection. Formerly if a person was injured on a railroad by the negligence of the agents and servants of the company, the person so injured could maintain an action and recover damages against the company; but if the person was killed, the administrator could not maintain the action; it does not survive. An act of the legislature was required to enable the personal representatives to institute the suit. See A. A. 1859; *Gen. Stat.* 1872, 507; *Gen. Stat.* 1882, § 2183. Why? Because there was no property in the corpse. Certainly

that is the legislative construction in this view of the judicial construction above quoted.

If the administrator, before this special legislation, could not sue for the killing of his intestate, when the act might have been the grossest negligence, how can it be maintained that when the intestate was killed by an assassin, who placed the cadaver on the railroad track to secrete suspicion or discovery, the administrator may maintain an action for injury to the corpse in which there is no right of property, which never came into his possession, but had been buried out of sight two weeks before he could obtain his letters of administration? It seems to me this is conclusive. The right of action was granted because the railroad was the immediate cause of the death, and the killing deprived the family of the intestate of his protection and support. But here the murder was already done, the family had already been deprived of the protection and support of the murdered man. He was cold in death before the first train passed, suffered no pain, no terror, nor agony of a violent death; the spirit had taken its flight, and he lay a lifeless mass in the track of the fury-snorting iron monster that pursued its accustomed way night and day in the service of the public, under the sanction of the legislature. It does seem to me to establish such a precedent will open a wide door for fraudulent and painful litigation.

It is urged that cases decide there is a right of burial for the corpse. There is or ought to be. But the plaintiff only claims damages for running over, disfiguring, and mutilating the dead body—not a word about the right of burial, nor is there any evidence on the subject. In fact, there was no hindrance to the burial or the right of burial. Conductor Clarkson, I suppose acting under the popular idea that a murdered man, or one killed accidentally, could not be moved until the coroner was notified, left the body where he found it and gave the first notice of a corpse needing burial. In fact, it could not have been legally buried before an inquest was holden.

Let the complaint be dismissed.

Plaintiff appealed.

*Messrs. L. F. Youmans* and *H. A. Meetze,* for appellant.

I. (1) This being an action at law, referred by consent to the referee to hear and determine the whole issue, who had found all the controverted questions of law and fact in favor of plaintiff, the plaintiff was at liberty to enter up judgment on the referee's report, and the jurisdiction of the Circuit Judge, if any he had, over the referee's action was only to confirm the report, and order judgment to be entered up thereon. *Code,* §§ 292, 294, 290, 344, 345; *Gen. Stats.,* § 2739; *Rules of Circuit Court,* No. XXX.; 14 *Stat.,* 528; *Code of* 1872, §§ 473, 474,—of 1882, §§ 450, 451; 18 *Stat.,* 56; 4 *S. C.,* 125; 5 *Id.,* 293.

(2) That if the Circuit Judge had other or further jurisdiction, in the most adverse view which he could legally take of plaintiff's rights, he could only have ordered a new trial, and have done that only in the event of the necessary preliminary steps being taken to warrant the exercise of such jurisdiction, which was not done. *Code,* §§ 286, 287,—of 1872, § 302; *Gen. Stats.,* § 2113; *Rules of Circuit Court,* Nos. XLVII., LI.; 20 *S. C.,* 295, 486; 19 *Id.,* 601; 18 *Id.,* 605, 231; 15 *Id.,* 612; 3 *Bl. Com.,* 406; 1 *S. C.,* 1; 2 *Id.,* 388; 6 *Id.,* 312; 12 *Id.,* 168.

II. (1) There is such property, or *quasi* property, or interest, in the dead body of a human being as to sustain a civil action for its wilful or negligent mutilation. 10 *R. I.,* 227; 14 *Am. Rep.,* 667; 4 *Bradf.,* 622; 13 *Ind.,* 138; 42 *Penn.,* 293; 4 *Amer. L. T.,* 127, 129; 3 *Amer. L. Rev.,* 182; 2 *Ad. & E. (N. S.),* 246.

(2) A living human being has a right of burial of his body when dead, and mutilating his dead body is such an interference with this right as to sustain a civil action. Authorities immediately *supra;* 12 *Ad. & E.,* 773; 2 *Hagg. Con. R.,* 348; 3 *Phill.,* 335; 1 *Chit. Pr.,* 50; 1 *Burns' Eccl. L.,* 251, 271, 372; 3 *Phill.,* 264; *Tyler Am. Eccl. L.,* §§ 971, 1161.

(3) The administrator is the proper party plaintiff in a civil action for mutilating the dead body of his intestate. *Gen. Stat.,* §§ 1893, 1926; *Com. Dig., Tit. Administration B.,* 10; 19 *Barb.,* 473; *Toll. Exors,* 133; 1 *Wms. Exors,* 784, 786; 2 *Id.,* 831; 2 *Shep. Touch.,* 474; 2 *Redf. Wills,* 227; 10 *Pick.,* 154; 13 *N. J.,* 150; 42 *Penn ,* 293; 10 *S. C.,* 182.

*Ubi jus, ibi remedium. Co. Lit.,* 197, *b ;* 1 *Thomas' Coke,*

902; *L. Raym.*, 938; 6 *Mod.*, 45; 1 *Sm. Lead. Cas.*, 342, 356; 6 *R. I.*, 463, 468.

*Boni judicis est ampliari justitiam.*   1 *Burr.*, 304; 9 *M. &
W.*, 818.

*Mr. J. H. Rion*, contra.

April 22, 1885. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON.   This action was brought by the plaintiff, appellant, as administrator of W. Scott Hook, de-ceased, to recover damages for the mutilation of the dead body of the intestate, and the destruction of the apparel in which it was clad, and of a silver watch at the time on the person of the de-ceased, all of which is alleged to have occurred by the gross neg-ligence of the defendant company in running a train of cars over said dead body three several times.   The defence denied neg-ligence, and claimed that the complaint did not state facts suffi-cient to constitute a cause of action.

The whole issue was by consent referred to a special referee to hear and determine the same.   The referee found as matter of law that the action by the administrator could be sustained.   As matter of fact, that the mutilation of the dead body, and the destruction of the wearing apparel resulted from the careless and negligent action of the defendant, and that the amount of the recovery was not limited to the value of the clothing, $30, and he found for the plaintiff $10,000 damages.   The decision of the referee was reviewed by his honor, Judge Aldrich, upon excep-tions, who, finding that the alleged negligence by defendant had not been proved, and that the plaintiff could not maintain the action, as administrator, because he had no property in the dead body of his intestate, dismissed the complaint.

The plaintiff has appealed upon numerous exceptions, all of which, however, have been condensed by appellant's counsel in his argument into certain propositions found below, which we have considered, and upon which we will now announce our con-clusions, without reference to the exceptions *seriatim*.   The two first involve questions of procedure, as follows :   1. "This being an action at law, referred by consent to the referee to hear and deter-

mine the whole issue, which being found in favor of the plaintiff both as to the law and fact, the plaintiff was at liberty to enter judgment on the referee's report; and the jurisdiction of the Circuit Judge, if any he had, was only to confirm the report and order judgment thereon." 2. "That if the Circuit Judge had other and further jurisdiction, in the most adverse view which he could legally take of plaintiff's rights, he could only have ordered a new trial, and have done this only in the event of the necessary preliminary steps being taken to warrant the exercise of such jurisdiction, which was not done."

If the reference in this case had been ordered and had before the adoption of the general statutes of 1882, the point raised in the first proposition above would not be so difficult, because then there was a section in the code which provided in terms that the report of a referee upon the whole issue should stand as a decision of the court, and judgment might be entered thereon in the same manner as if the action had been tried by the court.    *Old Code,* § 296.    And the practice under this section had been somewhat determined by the decisions of this court, especially in the case of *Kirkland* v. *Cureton* (4 *S. C.*, 124), where the Circuit Court ordered judgment upon the report of the referee, subject to appeal to this court, and upon appeal this court held that in a case at law, as that was, the decision below upon questions of law only, material to the case, could be reviewed here, the facts found by the referee being regarded as finally adjudicated, and beyond review ; citing the case of *Sullivan* v. *Thomas,* 3 *S. C.*, 531. This section, however, has been since stricken out (*Gen. Stat. of* 1882), and it is now no longer a part of the code, nor was it a part in 1883, when the order of reference was made in this case. It therefore has no application to the question now under discussion; nor has the case of *Kirkland* v. *Cureton, supra,* nor *Chalk* v. *Patterson,* 5 *S. C.*, 290, relied on by appellant.    On the contrary, sections 294 and 290 are the sections which now control in cases of this kind.

These sections, instead of authorizing judgment to be entered upon the report of the referee in the first instance, as formerly, and thereby becoming the judgment of the court, provide that the referee shall make his decision, stating the facts found and

conclusions of law separately, when it may be subject to review upon a case or exceptions in like manner and with like effect as in cases of appeal ; and although the court authorized to make the review is not mentioned expressly, yet from the subsequent provisions in the same section, where it is provided that when the case shall have been heard and decided upon the report of the referee and exceptions, the decision may be reviewed by the Supreme Court, the implication is manifest and necessary that the Circuit Court is the court authorized to review in the first instance. So that there can be no doubt as to the *jurisdiction* of said court in such cases.

Now, what is the extent of the jurisdiction of the Circuit Court in a case at law tried by a referee, when the decision of the referee is brought before it for review, as in the case at bar, is the next question. Section 294, *supra*, is the authority for the review, and it declares the extent of the power conferred. It provides that said review may be had in the *same manner* and to the *same extent* as appeal cases under section 290. In other words, it confers the same power upon the Circuit Courts as belongs to this court in appeals here. What is that power ? This court, in cases at law, has jurisdiction only for the correction of errors of law. It has nothing to do with the facts, except to apply the law to the facts as found ; the facts, as was said in *Kirkland* v. *Cureton*, *supra*, must "be regarded as finally adjudicated," whether found by a jury, or a referee substituted for the jury, and cannot be modified or reversed on appeal. Nor has the Circuit Court on the review of the referee's decision any such power. This court, as we have said, has power to correct and review the rulings of law below, and this may sometimes lead to a new trial, and sometimes to a dismissal of the complaint, and so may the action of the Circuit Court upon the review of the referee's decision, as that review is expressly authorized in like manner and with like effect as in cases of appeal. But neither· this court nor the Circuit Court is empowered in a case at law to disregard the findings of fact by the referee or the jury, and to re-try the case on its merits. It is conceded, too, that the Circuit Court has power to set aside the decision of the referee

and to order a new trial for the reasons for which new trials are usually granted when the necessary steps are taken to that end.

Such being our judgment as to the power of the Circuit Court in such cases, it follows that we must hold that his honor, the Circuit Judge, was in error when he undertook to review the findings of fact of the referee, and to apply the law to the new state of facts as found by himself. We think he should have taken the facts as reported—should have regarded them as finally adjudicated, and have applied the law as they might demand, reversing or affirming the conclusions of law of the referee as, in his judgment, they were erroneous or correct.

Apart from the question of procedure, the appellant contends, next, that there is such property or interest in the dead body of a human being as to sustain an action for its wilful or negligent mutilation, and that the right of action in such cases belongs to the administrator of the deceased. This proposition raises three questions as applicable to the case at bar: 1. What is meant by the term property? 2. Can this property attach to the dead body of a human being? And, 3. If so, does it belong to the administrator?

The term property may be defined to be the interest which can be acquired in external objects or things. The things themselves are not, in a true sense, property, but they constitute its foundation and material, and the idea of property springs out of the connection, or control, or interest which, according to law, may be acquired in them, or over them. This interest may be absolute, or it may be limited and qualified. It is absolute when a thing is objectively and lawfully appropriated by one to his own use in exclusion of all others. It is limited or qualified when the control acquired falls short of the absolute, which may be the case sometimes for several reasons not necessary to be adverted to here. Now, to entitle one to bring action for an injury to any specific object or thing, he must have a property therein of the one kind or the other mentioned. If he has no such property, he can have no cause of action, however flagrant or reprehensible the act complained of may be.

Can property, either absolute or qualified, be acquired in a corpse, and especially as involved in the case under investigation,

can such property be acquired by the administrator of the deceased? As to absolute property, Mr. Blackstone says: "Though the heir has a property in the monuments and escutcheons of his ancestors, yet he has none in their bodies or ashes." 2 *Bl. Com.*, 429. In *Jac. Fish. Dig.* it is said: "A dead body by law belongs to no one, and is therefore under the protection of the public." Mr. Bishop says: "There can be no property in a person deceased, consequently larceny cannot be committed of his body, but it can be of the clothes found upon the body, or of the shroud." *Bish. Crim. L.*, § 792. Citing *East P. C.*, 652;. *Hawkins'* and *Hale's Pleas of the Crown.* Mr. Wharton says: "*Corpus humanum non recipit estimationem.*" *Whart. L. Max.*, 228. Lord Coke said: The "burial of the cadaver, *nullius in bonis, caro data vermibus*"; flesh given to the worms. Mr. Blackstone said again: "This is the case of stealing a shroud out of the grave, which is the property of those, whoever they may be, that buried the deceased, but stealing the corpse itself, which has no owner, (though a great indecency) is no felony, unless some grave's clothes be stolen with it." 4 *Bl. Com.*, 235.

These are strong expressions from leading and distinguished authors, all tersely conveying the same doctrine and concurring to the full. We have been referred to no case by appellant in conflict with this doctrine, nor have we been able ourselves to find a case, or a single expression in any text-book, which affects it in the slightest degree. And that this should be so is not surprising. Because, while it is natural that we should all feel that the remains of ancestors and loved ones should be tenderly watched, and their decent interment carefully guarded, and the mutilation of their dead bodies and the disturbance of their sepulchres severely punished, and while all laws necessary to that end should be passed and strictly and sternly enforced, yet even for this purpose, to make such venerated remains the absolute property of any one, in the sense of objective appropriation, would be abhorrent to every impulse and feeling of our natures.

It is true, it is said that in some portions of Europe during the middle ages the law allowed a creditor to seize the dead body of his debtor, and in ancient Egypt the corpse of the father might be hypothecated by the son in order to borrow money. But

these were in semi-barbarous and heathenish times, and such ideas have no existence now in any portion of the globe. On the contrary, wherever civilization at least has dawned, or has commenced to throw even a flickering light upon the people, reverence for the dead has become a universal and a most sacred sentiment, one which would revolt at the idea of their remains becoming property, much less property in the sense of being appraised and placed upon the inventory of the administrator, subject to the payment of debts, and to distribution among the next of kin, which would be required by the law of this State if such remains could be regarded as property, and on that account passing to the administrator.

But can there not be a qualified property in the dead? one which gives control to some one with the view to protection, to decent interment, and to undisturbed repose, while they are dissolving and returning to the dust from which they were created? Can it be that there is no legal guardianship of the dead? And that when the life escapes the body is left, so far as the law is concerned, without protection, even from wanton and malicious depredation, and that those to whom it was bound in life by the tenderest of ties can invoke the aid of no court in preventing its mutilation? And must they resort to violence and force for this purpose? If such be the fact, it is a reproach to our judicial system, and one which calls earnestly for legislative interposition. And yet such seems to be the fact, at least the matter is left in great doubt, so far as our limited examination of the cases, both in this country and in England, amid the press of our duties, has enabled us to ascertain.

Certainly the administrator has no legal control or authority over the dead body of the person upon whose estate he has administered. His entire authority is derived from the act, by virtue of which his letters have been granted to him, and that gives him charge only of the "goods and chattels, rights and credits," which were of the deceased. The body of the intestate belongs to neither of these classes, and there is, therefore, no law for him to take it in charge. True, he is required to pay, as the first of debts, the funeral expenses, but it would be a violent assumption to conclude on that account that he becomes the legal custodian

of the remains, or even if he should, it could only be so as to the funeral and burial, because the expenses extend no further—they stop at the grave. The question would then arise, who could legally protect beyond that point, and in whose behalf could the law be invoked to redress an invasion of the tomb?

We have looked diligently through the common law reports of England, and have found no case in which the civil courts have been appealed to in matters connected with the bodies of the dead. On the contrary, their burial, the grave-yards and cemeteries in which they are interred, and the religious ceremonies observed, have been left exclusively to ecclesiastical cognizance, the civil courts universally holding, in the language of Lord Coke, that the burial of the cadaver is *nullius in bonis.* In some of the States upon this continent, especially in Rhode Island, Indiana, Pennsylvania, and New York, the courts, endeavoring to escape from this reproach, have held in general terms that the corpse belongs, not to the administrator, but to the next of kin, and that is as far as the cases referred to by appellant's counsel seem to go.

In the case of *Pierce* v. *Proprietors of Swan Point Cemetery* (10 *R. I.*, 227), it was held that while a dead body is not property in the strict sense of the common law, it is *quasi* property, over which the relatives of the deceased have rights which the courts will protect. In the case of *In re Widening Beekman Street* (4 *Bradf. Rep.*, 503), it was held that the right to bury the corpse and to preserve its remains is a legal right which the courts will protect; that such right, in the absence of any testamentary disposition, belongs exclusively to the next of kin. In *Bogert* v. *City of Indianopolis* (13 *Ind.*, 135), it was held that the bodies of the dead belong to the surviving relatives in the order of inheritance, as property. In *Wynkoop* v. *Wynkoop* (42 *Pa. St.*, 293), it was held: "That a wife has no right or control over the body of her husband deceased, after burial. The disposition of the remains of the deceased belongs thereafter exclusively to his next of kin; that though it was her duty to bury the body, that as widow after interment her right ended."

Upon what authority or established principle of the common law these decisions were founded, even to the extent of legalizing the right of the nearest of kin, does not fully appear, but they

afford no support to the position that the administrator has any control whatever, which is the question here. We have no case in our own reports upon the subject, certainly no case bearing upon the precise point before us, *i. e.*, the rights of the administrator. In the absence of all authority, and looking at the act which authorizes administration, and defines the duties and powers of administrators, and describes the property which by operation of law becomes his, we are constrained to the conclusion that so far as this action is founded upon the mutilation of the deceased by the defendant company, whether accidental, wilful, or negligent, it cannot be sustained by the plaintiff, and that his honor, the Circuit Judge, was correct in so holding.

This, however, does not apply to the clothes in which the body was clad, and the silver watch upon the person. As to these, the administrator was the legal owner, and his appointment, though made after the occurrence, reached to the death, his title commencing at that time. As to these, then, the action was maintainable, and we think that his honor was in error in not so holding. *McClane's Adm'r* v. *Elder*, 2 *Mill Con. R.*, 184; *Dealy* v. *Lance*, 2 *Speer*, 487.

But the majority of this court having, in the case of *Meetze* v. *C. C. & A. R. R. Co. (ante* 1), determined that the Circuit Judge had the power to review and reverse the findings of fact of the referee, and he having exercised that power in this case—

The judgment of this court, therefore, is that the judgment of the Circuit Court be affirmed.